**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **DAVID E. RINGLER,** ) | **CASE NO. 1:13CV2349** |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **MAGISTRATE JUDGE** |
| ) | **GEORGE J. LIMBERT** |
| ) | |
| **CAROLYN W. COLVIN**[1], ) | |
| **ACTING COMMISSIONER OF** ) | **MEMORANDUM OPINION & ORDER** |
| **SOCIAL SECURITY,** ) | |
| ) | |
| **Defendant.** ) | |

David E. Ringler ("Plaintiff"), seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the Court AFFIRMS the ALJ's decision and dismisses Plaintiff's case with prejudice.

## I.  PROCEDURAL AND FACTUAL HISTORY

Plaintiff applied for DIB on March 18, 2011, alleging disability since April 16, 2010 due to chronic obstructive pulmonary disease ("COPD"), panic attacks, lumbar segental dysfunction/disc degeneration lumbar, gout/arthritis and depression. ECF Dkt.#14, Transcript of proceedings ("Tr.") at 73, 167-168. The SSA denied Plaintiff's applications initially and on reconsideration. *Id*. at 87-88, 94-100. Plaintiff requested an administrative hearing, and on May 7, 2012, the Administrative Law Judge ("ALJ") conducted an administrative hearing and accepted the testimony of Plaintiff, who was represented by counsel, and a vocational expert ("VE"). *Id.* at 9, 30. On June 7, 2012, the ALJ issued a Decision denying benefits. *Id*. at 14-23.

Plaintiff requested review of the Decision, and on August 23, 2013, the Appeals Council denied the request for review. Tr. at 1-3. On October 23, 2013, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On February 1, 2014, Plaintiff filed a brief on the merits. ECF

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

Dkt. #16. On February 28, 2014, Defendant filed a brief on the merits. ECF Dkt. #17. Plaintiff filed a reply brief on March 14, 2014. ECF Dkt. #18. The parties consented to the jurisdiction of the undersigned on February 11, 2015. ECF Dkt. #19.

## II. MEDICAL AND TESTIMONIAL EVIDENCE

### A. Medical history relevant to Plaintiff's onset date

On March 26, 2010, Plaintiff was referred for a pulmonary function evaluation by Dr. Chillcott, his primary care physician. Tr. at 225. The evaluation showed no obstructive airway disease and no restrictive lung disease, although a mildly reduced lung diffusion was noted. *Id.*

On May 12, 2010, Plaintiff presented for follow-up with Dr. Chillcott and was informed that his pulmonary function test showed evidence of small airways disease with impaired oxygen diffusion. Tr. at 273. He was advised to quit smoking and was counseled on using Chantix to do so. *Id.* Plaintiff reported that he might not be able to afford Chantix. *Id.* Dr. Chillcott noted Plaintiff's history of chronic low back pain and gave him a trial of Nabametone for his arthritis symptoms. *Id.* Dr. Chillcott diagnosed suspected COPD. *Id.*

On August 16, 2010, Plaintiff presented for follow-up with Dr. Chillcott and he informed Dr. Chillcott that he had successfully quit smoking. Tr. at 269. He explained that he was using Chantix to stop smoking, but it gave him nightmares so he stopped taking it. *Id.* He also reported that he was waking up in the middle of the night with anxiety attacks and he had low energy and enjoyment of life. *Id.* He stated that he had a hard time remembering things and he was having epigastric burning. *Id.* Dr. Chillcott made no notations as to back pain or an examination of Plaintiff's back. *Id.* He diagnosed suspected mixed anxiety with panic attack with depression, gastritis and possibly sleep apnea. *Id.* Dr. Chillcott ordered a sleep study and started Plaintiff on Citalopram and Omeprazole and continued his other medications. *Id.*

On October 8, 2010, Plaintiff presented to Dr. Chillcott for follow-up and he complained of pain in his right forefoot. Tr. at 267. Plaintiff indicated that his mood was much better on Citalopram. *Id.* Dr. Chillcott performed a physical examination, but did not note examination results or complaints regarding Plaintiff's back. *Id.* He renewed Plaintiff's prescriptions. *Id.*

On January 18, 2011, Plaintiff presented to Dr. Chillcott complaining of biting his tongue constantly and a tingling in his tongue. Tr. at 263. Dr. Chillcott noted that Plaintiff had a history of anxiety disorder with panic attacks and was afraid to drive his car to see his son. *Id*. Plaintiff also complained to Dr. Chillcott of low back pain, with no numbness, tingling or weakness, and no radiation to his legs. *Id.* Upon examination, Dr. Chillcott found that Plaintiff had truncal obesity and tenderness over the L4-L5, L5-S1 facet joints, as well as paravertebral tenderness and limited flexion. *Id*. He diagnosed Plaintiff with chronic back pain, ordered an x-ray of the lumbar spine, and prescribed Ultram. *Id*.

On April 21, 2011, Plaintiff presented to Dr. Chillcott for his chronic depression. Tr. at 255. Dr. Chillcott diagnosed persistent depression and gave Plaintiff a trial of Cymbalta. *Id.* It was noted that Plaintiff had gradually weaned himself off of Citalopram because of tongue swelling and then had a severe withdrawal reaction with dizziness, lightheadedness and cramping. *Id*. Plaintiff reported an irritable mood and inability to enjoy himself. *Id*. On May 20, 2011, Plaintiff followed up with Dr. Chillcott for his mood disorder. *Id*. at 253. Dr. Chillcott noted that the Cymbalta seemed to be helping Plaintiff as his mood disorder was stable. *Id.* Plaintiff informed Dr. Chillcott that x-rays showed that he had DDD. *Id.*

On May 20, 2011, Plaintiff was assessed by Dr. Larry Infield, D.C. for his complaints of back pain Tr. at 248. He noted upon examination that Plaintiff had pain with palpation over the lumbar spine, a short right leg that gets even on flexion, and pain with palpation over the lumbar facets at L4-L5 and over the sacroiliac joint. *Id.* Plaintiff's lumbar flexion was limited, but his reflexes were normal and straight leg-raising was negative. *Id*. X-rays showed spinal DDD between L5-S1 and spinal misalignments at L4-L5. *Id*. at 248, 250. Dr. Infield diagnosed lumbar segmental dysfunction at L4-L5 and lumbar DDD. *Id*. at 248. Dr. Infield adjusted Plaintiff's spine and recommended that Plaintiff ice his back at home and undergo additional chiropractic manipulation treatments twice per week for four weeks. *Id*. at 249. Plaintiff underwent treatment with Dr. Infield as recommended. *See id.* at 316-338.

Dr. Infield wrote a letter to Dr. Chillcott upon his examination of Plaintiff and included his initial examination report with the letter. Tr. at 338, 340. Dr. Infield reported that Plaintiff presented

to him with complaints of gradual onset of severe back pain symptoms over the past year, but no leg symptoms or urinary or bowel dysfunction. *Id*. at 338. Dr. Infield noted that Plaintiff reported an increase in his symptoms and an inability to perform normal work activities because of the pain and he had difficulty walking, seeing, squatting, climbing, kneeling, bending, twisting, carrying, lifting, pulling, riding in a car, performing sports, exercising, and he had nervousness and irritability. *Id*. Plaintiff also reported sleep problems because he was waking up in the middle of the night due to pain. *Id.* He described the pain as aching and throbbing on both sides that was aggravated by bending forward, bending back, bending or twisting to either side, standing and lifting. *Id*. at 339. He reported that it was brought on by sitting and relieved by resting and lying down. *Id.* Dr. Infield opined that Plaintiff's prognosis was fair. *Id*. at 342.

The record of this case also contains Dr. Infield's notes from treating Plaintiff in 2008 after he was involved in a motor vehicle accident. Tr. at 344- One of Dr. Infield's diagnoses during this course of treatment was lumbar strain/sprain and spinal manipulation adjustments to Plaintiff's L3-L4. *Id*. at 358, 360, 362, 364, 366, 368, 370, 372, 382, 384. Other records from Dr. Infield show that Plaintiff also underwent x-rays of his lumbar spine in 2001 which showed lumbar DDD at L5-S1 and rotational misalignments of the lumbopelvic spine. *Id*. at 389.

On July 21, 2011, Dr. Michael Firmin, Ph.D. completed a psychological evaluation of Plaintiff for the agency. Tr. at 308. Plaintiff reported to Dr. Firmin that he could not work primarily because of his panic attacks, but gout, DDD, and COPD were also factors. *Id*. Dr. Firmin diagnosed depressive disorder not otherwise specified, panic disorder without agoraphobia, and alcohol dependence. *Id.* He assessed Plaintiff's symptom GAF and function GAF at 65, which indicated mild symptoms. *Id.* He opined that Plaintiff had no impairment in understanding simple written or verbal instructions or in remembering instructions and he had no difficulties in following instructions in routine activities or in completing multiple step tasks. *Id.* at 313. He opined that Plaintiff reported some trouble concentrating, but at the evaluation, he was able to maintain sufficient attention to complete the tasks given him to the best of his intellectual ability. *Id*. As to responding appropriately to supervisors and co-workers in a work setting, Dr. Firmin opined that Plaintiff had no impairment in connecting with other people and a fair ability to get along with supervisors. *Id*.

-4-

at 313-314.  Dr. Firmin further opined that Plaintiff had an adequate ability to handle work stress, although it was noted that Plaintiff's weight may affect his stress management capabilities, and Plaintiff's amount of pain experienced on any given workday.  *Id*. at 314.

On July 13, 2011, Plaintiff presented to Dr. Infield complaining of low back pain that was unchanged from the prior visit.  Tr. at 318.  Dr. Infield noted spinal fixation at L4-L5, tenderness to palpation over the lumbar area, and restricted thoracic range of motion.  *Id.*  He diagnosed lumbar segmental dysfunction at L4-L5 and lumbar DDD, recommended that Plaintiff engage in moderate activities, such as walking or pushing a vacuum cleaner, icing his back, and undergoing chiropractic manipulation treatments.  *Id*. at 318-319.  Dr. Infield indicated that Plaintiff responded favorably to the treatment.  *Id.* at 319.

Dr. Infield's July 27, 2011 treatment note indicated that Plaintiff presented complaining of low back pain unchanged from his last treatment.  Tr. at 316.  Upon examination, Dr. Infield reported that Plaintiff had spinal fixation at L4 and L5, tenderness to palpation over the lumbar area, and a restricted thoracic range of motion.  *Id.*  Plaintiff underwent a spinal adjustment at L4-L5.  *Id*. at 317.

On September 28, 2011, Plaintiff presented to Dr. Chillcott complaining of shortness of breath and pain in his lower back at the L4-L5 with difficulty standing but no radiation to his arms, legs or back and no numbness, tingling or weakness.  Tr. at 401.  Dr. Chillcott noted that Plaintiff was no longer seeing Dr. Infield.  *Id*.  Dr. Chillcott noted on physical examination that Plaintiff had negative straight leg raising and a full range of motion of his back.  *Id.*  Dr. Chillcott diagnosed low back pain of uncertain etiology, gave Plaintiff a trial Lidoderm patch for his back, and referred him to physical therapy.  *Id*.

On November 4, 2011, Dr. Infield completed a questionnaire indicating that he first began treating Plaintiff on May 20, 2011 and last treated him on July 27, 2011.  Tr. at 244.  He noted that Plaintiff's gait was normal, but he had limited motion in the joints and spine and such symptoms had persisted since May 20, 2011 and the year prior, with little improvement despite fairly good compliance by Plaintiff.  *Id.*  Based upon his examination and x-rays of Plaintiff, he diagnosed lumbar segmental dysfunction at L4-L5 and lumbar disc degeneration.  *Id*. at 248.

-5-

On November 16, 2011, Dr. Chillcott examined Plaintiff for his chronic low back pain and noted that Plaintiff had four physical therapy sessions but felt no benefit from them. Tr. at 426. Upon examination, Dr. Chillcott noted that Plaintiff had tenderness over the L4-L5 and L5-S1 facet joints, no sciatic notch tenderness, and straight leg raising limited only at 60 degrees bilaterally. *Id*. He diagnosed low back pain with perhaps facet joint syndrome or spinal stenosis. *Id*. He noted that a MRI may be necessary if Plaintiff's symptoms failed to improve with physical therapy. *Id*. He renewed Plaintiff's prescriptions. *Id.*

On December 15, 2011, Plaintiff underwent a sleep study and results showed that he had obstructive sleep apnea that was controlled with a CPAP machine. Tr. at 450. He was advised to begin CPAP therapy, lose weight, and not to use alcohol, caffeine or nicotine. *Id.*

On February 16, 2012 and March 13, 2012, Plaintiff presented to Dr. Chillcott for problems related to skin tags. Tr. at 453-454. No mention was made of his back. *Id.*

On December 23, 2011, January 31, 2012, and February 29, 2012, Plaintiff followed up with Dr. Sunmonu for his chronic exertional shortness of breath, mild obstructive sleep apnea, COPD, hypertension and insomnia. Tr. at 460-463.

On April 13, 2012, Dr. Chillcott completed a pain questionnaire on behalf of Plaintiff for the time period of April 16, 2010 through April 13, 2012. Tr. at 465. He indicated that Plaintiff's physical and mental impairments that were capable of producing pain were gastroesophageal reflux disease, depression, which was stable, panic attacks of one per week over the past two months that had increased due to stress, and COPD. *Id*. He listed Plaintiff's subjective complaints as low back pain, pain with repetitive bending, and occasional shortness of breath. *Id.* He affirmed that Plaintiff's complaints were reasonably derived from an underlying impairment as established by his objective and clinical findings. *Id*. He also affirmed that the intensity and persistence of Plaintiff's pain affected Plaintiff's ability to perform basic work-related activities due to the pain in lifting or bending. *Id.* He found no psychological component to Plaintiff's allegations of pain and he believed that Plaintiff's pain was often severe enough to interfere with his attention and concentration. *Id.* He also indicated that Plaintiff was being truthful about his perception of pain. *Id*.

On the same date, Dr. Chillcott completed a medical statement of Plaintiff's physical abilities and limitations, opining that from April 16, 2010 through the present date, that Plaintiff could work a total of four hours per day, standing up to fifteen minutes at a time and two hours per workday, sitting up to fifteen minutes at a time up to two hours per day, and lifting up to fifty pounds occasionally and ten pounds frequently. Tr. at 482. Dr. Chillcott further opined that Plaintiff could occasionally bend, stoop and balance, and frequently perform fine and gross manipulations with both hands, and occasionally raise his arms over shoulder level, work around dangerous equipment, and operate motor vehicles. *Id.* As to operating motor vehicles, Dr. Chillcott limited Plaintiff to only two hours of operating a motor vehicle, and he opined that Plaintiff could occasionally tolerate heat but never tolerate the cold or dust, smoke or fumes. *Id.* He further opined that Plaintiff could never tolerate heights and had limited close vision. *Id.* He also opined that Plaintiff suffered from moderate pain and would be absent from work more than three times a month. *Id.*

On April 30, 2012, a lumbar spine MRI showed that Plaintiff had: grade 1 minimal spondylolisthesis at L4-L5 without significant canal stenosis, but with facet degenerative changes and rostrocaudal facet subluxation causing mild left foraminal stenosis; mild osteophyte formation confined to the anterior epidural fat without significant impact on the thecal sac at L5-S1; facet degenerative changes and rostrocaudal facet subluxation cause mild right and moderate left foraminal stenosis; and a very small eccentric disc protrusion at T11-T12. Tr. at 486.

### B. Hearing testimony

At the hearing, Plaintiff testified that he was fifty-four years old and had a high school education. Tr. at 33. His prior work experience included working as the head of a shipping and receiving department as a tow motor driver, a coal tester, and a collator operator for a business forms company. *Id.* at 33-34.

When asked by the ALJ why he felt that he was disabled, Plaintiff responded that he had chronic DDD so he could not stand and bend over more than a couple of times without experiencing back pain. Tr. at 34. He testified that he could not stand in the same spot for a long period of time before having to sit down or move. *Id.* He related that his COPD made it very hard to breathe and walking or going up a couple of steps made him feel like he had an elephant sitting on his chest. *Id.*

He also noted that he had panic attacks which come on at any time and he has gout which sometimes renders him bedridden. *Id*. at 35. Plaintiff opined that he could stand for about five minutes at a time. *Id*.

Plaintiff described his panic attacks, indicating that when one came on, it felt like a heart attack and he gets nervous and has to stop what he is doing because his mind runs and his heart starts beating fast and he feels like he is going to have a heart attack. Tr. at 36. He indicated that after a panic attack, he is totally drained. *Id*. He explained that sometimes the panic attacks last up to two hours, but if he can get to his medicine, they last about 15-20 minutes. *Id.* He had his last panic attack two weeks prior and the flare of panic attacks last about two days, even with his medication. *Id*. He was not seeing a psychiatrist and received his mental health medications from Dr. Chillcott and sometimes from his pulmonologist. *Id*. at 49.

Plaintiff indicated that it was better for him to move around rather than stand in one place and he could walk about the length of a football field. Tr. at 37. He described his daily routine as waking up, getting a cup of coffee, checking the weather, walking out to get the newspaper, helping his mother and sister in the house to the extent that he could, reading the paper, making lunch, going outside if it is nice and walking his dog around the block, having dinner and then sitting down and watching television for the rest of the night. *Id*. at 37-38. He told the ALJ that he likes to fish and he last fished last year for about an hour. *Id*. at 38. He fished a few times more the year before as he has a buddy that owns a lake. *Id*. at 39. He estimated that he could sit and fish for about half an hour but could stay for about two hours if he gets up and moves around. *Id*. at 39-40. He also testified that he likes to play video games with his grandson once in awhile and drives him to the park. *Id*. at 38. Plaintiff estimated that he could sit for up to a half hour at a time before he would have to get up for about fifteen to twenty minutes before he could sit down again. *Id*. at 40. He stated that he could walk for about a half hour at a time, but could not stand in place. *Id*. He thought that he could lift a couple of pounds at a time, but not repetitively for a few hours a day. *Id*. at 41.

Plaintiff also testified that he has a gout attack about once or twice per month even with medication and dieting. Tr. at 42. He explained that the medication lessened the intensity of the gout attacks but not their frequency, and an average gout attack lasts two days. *Id*. at 43. He stated

that it starts in his ankles and feels like arthritis and spreads through to his knees, wrists and hands. *Id.*

Plaintiff indicated that he could ascend three steps before becoming out of breath and he has slight panic attacks daily since his mother passed away last month. Tr. at 44. Prior to that, Plaintiff estimated that he had at least a dozen panic attacks in a month. *Id*. at 45. He noted that his medication had been increased which helped decrease the intensity of the panic attacks and their duration. *Id*. He also noted that he has sleep apnea. *Id*. at 48.

The VE then testified. Tr. at 49. The ALJ presented a hypothetical person with Plaintiff's age, education and work experience with limitations to: lifting, carrying, pushing and pulling up to twenty pounds occasionally and ten pounds frequently; walking and standing four hours out of an eight-hour workday; sitting for six hours out of an eight-hour workday; occasionally using a ramp or stairs; never using a ladder, rope or scaffold; frequently balancing; occasionally stooping, kneeling, crouching and crawling; occasional bilateral overhead reaching; no exposure to high concentrations of smoke, fumes, dust and pollutants; no exposure to unprotected heights, but he could occasionally be around workplace hazards; limitations to tasks that are moderately complex, simple, routine, low stress, no high production quotas, no piece rate work, no work involving arbitration, negotiation or confrontation, in a static environment, with only superficial contact with the public in short durations and for specified purposes. *Id*. at 50-51. The VE concluded that such a hypothetical person could not perform any of Plaintiff's past relevant work, but other jobs existed in significant numbers in the economy for such a person, including the representative occupations of housekeeping cleaner, sales attendant, and mail clerk. *Id*. at 51.

Plaintiff's counsel questioned the VE, modifying the ALJ's hypothetical person by adding absenteeism from the job an average of three times or more per month. Tr. at 53. The VE opined that no jobs would be available for such a person. *Id*. Plaintiff's counsel also added an off-task limitation of 20% percent per day and the VE responded that no jobs would be available for a person with such limitations. *Id*.

### III. **SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffers from osteoarthritis and allied disorders, obesity, affective disorder, and panic disorder without agoraphobia, which qualified as severe impairments under 20 C.F.R. §416.920(c). Tr. at 16. The ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526 ("Listings"). *Id*.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by 20 C.F.R. § 404.1567(b) with the additional limitations of: standing and walking four hours each in an eight-hour workday; sitting up to six hours in an eight-hour workday; occasionally climbing ramps and stairs; never climbing ladders, ropes or scaffolds; frequently balancing and occasionally stooping, kneeling, crouching and crawling; no more than occasional overhead reaching bilaterally; constant handling, fingering and feeling; no exposure to occasional concentrations of smoke or fumes; no more than occasional exposure to workplace hazards but no exposure to unprotected heights; simple, routine, repetitive work to moderately complex tasks in a static environment; low stress work with no high production quotas or piecework; no work involving arbitration, confrontation and negotiation; and no more than superficial interaction with the public. Tr. at 18. The ALJ ultimately concluded that although Plaintiff was unable to perform his past work as a shipping receiving clerk, tow motor operator or coal inspector, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including the representative occupations of housekeeping/cleaner, sales attendant and mail clerk. *Id*. at 22-23. Consequently, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

### IV. **STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS**

An ALJ must proceed through the required sequential steps for evaluating entitlement to social security benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

    2.    An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

    3.    If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

    4.    If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

    5.    If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## V.    STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by §205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234 (6th Cir. 2007). Accordingly, when substantial evidence supports the ALJ's denial of benefits, that finding must be affirmed, even if a preponderance of the evidence exists in the

record upon which the ALJ could have found plaintiff disabled. The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir.2001). However, an ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).

## VI.     LAW AND ANALYSIS

Plaintiff first asserts that the ALJ inadequately articulated his reasons for rejecting the opinions of his treating physician Dr. Chillcott. ECF Dkt. #16 at 7-9.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled

-12-

and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson,* 378 F.3d at 544 quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999).  Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers,* 486 F.3d at 243, citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.,* citing  20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion.  *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors."  710 F.3d at 376. The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Id.* at 377.

In the instant case, the ALJ gave less than controlling weight to Dr. Chillcott's medical source statement. Tr. at 21.  In attributing "limited weight" to the statement, the ALJ reasoned that it was not supported by Dr. Chillcott's own treatment records. *Id.* He went on to state that Dr. Chillcott treated Plaintiff for hyperlipidemia and skin tags. *Id.*  He reasoned that while Dr. Chillcott referred to Plaintiff's history of glasses, shortness of breath, depression, anxiety and low back pain, "Dr. Chillcott did not record his observations regarding Mr. Ringler's behavior, and ability to function." *Id.*  He elaborated that Dr. Chillcott did not refer to Plaintiff's abilities to sit, stand, or walk in any of his physical examinations of Plaintiff in 2010, 2011 or 2012. *Id.*

-13-

The Court finds that the ALJ committed error in his treating physician rule analysis. First, Dr. Chillcott treated Plaintiff for nearly all of his ailments, including his chronic low back pain, not just hyperlipidemia and skin tags as the ALJ implied. Tr. at 21. Thus, this reason is not supported by substantial evidence. Secondly, the Court is aware of no social security law, regulation or rule requiring a treating physician to record work-related abilities in his or her treatment notes in order to obtain controlling weight status under the treating physician rule. Treatment notes are "not written with the intention of outlining functional limitations." *Diack v. Colvin*, No. 1:12CV2513, 2013 WL 3822294, at *7 (N.D. Ohio July 23, 2013). Rather, they are maintained "for the purposes of improving a patient's condition, and they...may often speak in terms of maladies, not functional capacities." *Id*. Moreover, work-related abilities are part of the RFC which is ultimately determined by the ALJ and not a treating physician. 20 C.F.R. §§ 404.1527(d)(2), 404.1546(c). Thus, the Court finds that this reason is also inadequate.

Third, while Dr. Chillcott mainly limited his observations and findings as to the specific ailment or ailments about which Plaintiff complained at each visit, Dr. Chillcott did record notes of Plaintiff's complaints of back pain and his examination findings related thereto. In particular, Dr. Chillcott's January 18, 2011 treatment note indicated that Plaintiff complained of chronic low back pain with no radiation to the legs, and no numbness, tingling or weakness. *Id*. at 263. Upon examination, Dr. Chillcott noted that Plaintiff had tenderness over the L4-L5, L5-S1 facet joints, paravertebral tenderness, and flexion to only 90 degrees in neutral position. *Id.* Dr. Chillcott also noted Plaintiff's back pain complaints on September 28, 2011, indicating that Plaintiff complained of back pain when he stood, but he had no radiation to his arms or legs, and no numbness, tingling or weakness. *Id.* at 401. Dr. Chillcott's examination showed that Plaintiff's straight leg raising test was negative and Plaintiff had full range of motion in his back. *Id.* Dr. Chillcott prescribed a trial Lidoderm patch and referred Plaintiff to physical therapy. *Id.* Dr. Chillcott noted that while Plaintiff requested a stronger medication for his back pain, he was "not going to prescribe narcotics for this individual." *Id*. Thus, the Court finds this reason for rejecting Dr. Chillcott's opinions both inadequate and unsupported.

-14-

However, while the ALJ's treating physician rule analysis is lacking, a violation of the good reasons rule can be deemed "harmless error" if "(1) a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of § 1527(d)(2) ... even though he has not complied with the terms of the regulation." *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 551 (6th Cir.2010) (quoting *Wilson*, 378 F.3d at 547).

Here, the Court finds that the ALJ's violation of the good reasons rule is harmless error. The ALJ did adopt some of Dr. Chillcott's restrictions and restricted Plaintiff even more than Dr. Chillcott in one area. The ALJ limited Plaintiff to lifting, carrying, pushing and pulling up to twenty pounds occasionally and ten pounds frequently where Dr. Chillcott limited Plaintiff to lifting up to fifty pounds occasionally and ten pounds frequently. Tr. at 21, 482. The ALJ also limited Plaintiff to occasionally stooping, no more than overhead reaching bilaterally, and never exposing Plaintiff to unprotected heights. *Id.* at 18. Dr. Chillcott rendered these same limitations. *Id.* at 482.

However, the ALJ did not adopt all of the restrictions opined by Dr. Chillcott. And while the ALJ's discussion of the reasons why he attributed less than controlling weight to Dr. Chillcott's opinions is lacking, a review of the rest of his decision leads the Court to conclude that he complied with the goal of 20 U.S.C. § 404.1527(d)(2). In applying the treating physician rule, the ALJ should compare the consistency of the physician's opinion to the record as a whole. 20 C.F.R. § 404.1527(d)(2); *see Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978)(a disability determination should be made on the basis of the record as a whole.). When making such a comparison, "the ALJ may consider evidence such as the claimant's credibility, whether or not the findings are supported by objective medical evidence, as well as the opinions of every other physician of record. *See* SSR 96–5p, 1996 WL 374183, at *3 (S.S.A. July 2, 1996); SSR 96–8p, 1996 WL 374184, at *5 (S.S.A. July 2, 1996); *Hickey–Haynes v. Barnhart*, 116 Fed.Appx. 718, 726 (6th Cir.2004) (An ALJ may 'consider all of the medical and nonmedical evidence.' (quotation marks and citation omitted))." *Coldiron v. Comm'r of Soc. Sec.*, No. 09-4071, 391 Fed. App'x 435, 442 (6th Cir. Aug. 12, 2010), unpublished.

The ALJ reviewed the medical evidence, Plaintiff's testimony and statements, and the third-party statements of Plaintiff's daughter, son, and sister. Tr. at 18-21. The ALJ is correct that Dr. Chillcott's treatment notes did not support the extreme limitations that he opined for Plaintiff based upon Plaintiff's back pain. Only a few instances in all of Dr. Chillcott's treatment notes indicated that Plaintiff complained of low back pain. The ALJ identified the January 18, 2011 and September 28, 2011 treatment notes in which Plaintiff complained of low back pain, but he noted that Plaintiff reported no radiation to his legs, no numbness, no tingling and no weakness. *Id*. at 19, citing Tr. at 401, 411. The ALJ also noted Dr. Chillcott's findings of tenderness and somewhat limited flexion on January 18, 2011 and Plaintiff's full range of motion and negative straight leg raising on September 28, 2011. *Id.* The ALJ noted that Dr. Chillcott prescribed physical therapy and Plaintiff attended three or four out of six appointments and was then discharged for failure to keep scheduled appointments. *Id*. at 19, citing Tr. at 401, 441. Physical therapy notes indicated that Plaintiff reported feeling better after physical therapy and his symptom rating after therapy was 0 on a ten-point scale. *Id*. at 443-444. Chiropractic treatment notes also showed that Plaintiff experienced improvement in his symptoms after treatment. *Id.* at 322-324.

Further, while Dr. Chillcott indicated in the medical source statement that he treated Plaintiff for low back pain and it caused the severe restrictions that he opined, he did not identify Plaintiff's back impairment in the accompanying pain questionnaire which asked him to identify the impairments that were capable of producing pain for Plaintiff. Tr. at 465, 482. Rather, Dr. Chillcott identified Plaintiff's GERD, depression, panic attacks, mild COPD and hypertension. *Id.* Under the next question of the pain questionnaire which asked for a summary of Plaintiff's subjective complaints, Dr. Chillcott then noted Plaintiff's low back pain and indicated "pain with repetitive bending; 8/10 in intensity." *Id*. He then affirmed that the intensity and persistence of pain as Plaintiff experienced it affected his ability to perform work-related activities because it "hurts to lift or bend." *Id.* Nevertheless, none of Dr. Chillcott's treatment notes that discuss Plaintiff's back pain support a basis for his extreme limitations for Plaintiff.

Moreover, the ALJ noted that Plaintiff took a minimal amount of medication for his back pain and stopped conservative therapy from his chiropractor and physical therapist, which he

concluded showed that Plaintiff's back impairment was not as disabling as he alleged. Tr. at 21, 322-324, 443-444. He also noted that Dr. Chillcott refused to prescribed narcotics for Plaintiff's back pain and Plaintiff reported improvement when he was given medication by Dr. Chillcott. *Id.* Such findings also undermine the consistency and supportability of Dr. Chillcott's opinion. *Coldiron v. Comm'r of Soc. Sec.,* No. 09–4071, 391 Fed. Appx. 435, 440 (6th Cir. Aug 12, 2010), unpublished (finding that ALJ's failure to comply with treating physician rule harmless when ALJ's evaluation of other physician opinions and claimant's credibility undermined consistency and supportability of treating physician's opinion).

Based upon the above, the Court finds that the ALJ's decision as a whole indirectly attacked the supportability and consistency of Dr. Chillcott's opinions and met the goal of 20 C.F.R. § 404.1527(d)(2) as it provided sufficient articulation and substantial evidence to support his decision to attribute less than controlling weight and to limit the weight given to the opinions of Dr. Chillcott. Plaintiff also asserts that even assuming that the ALJ sufficiently articulated his reasons for not attributing controlling weight to Dr. Chillcott's opinions, he nevertheless erred by not articulating his reasons for the weight that he did give to Dr. Chillcott's opinions. ECF Dkt. #16 at 9-11. The Court finds no merit to this assertion as the reasons that the ALJ did articulate went precisely to explaining why he afforded only "limited weight" to Dr. Chillcott's opinions. He cited to Dr. Chillcott's severe restrictions for Plaintiff and discussed the evidence that lead him to conclude that those restrictions were unsupported and inconsistent. He cited to Dr. Chillcott's treatment records, which he had detailed earlier in his decision, and he discussed Plaintiff's conservative treatment for his back by way of physical therapy which he did not complete, mild pain medications, Dr. Chillcott's refusal to prescribed stronger medications for his back pain, and Plaintiff's reports of improvement when he did comply with physical therapy. Tr. at 18-21. The Court finds that the ALJ's analysis sufficiently addressed his reasons for attributing "limited weight" to Dr. Chillcott's

-17-

opinions and substantial evidence supports those reasons as contained in the record.

## VII. CONCLUSION

For the foregoing reasons, the Court AFFIRMS the ALJ's decision and dismisses Plaintiff's case with prejudice.

DATE: February 13, 2015

                                              */s/George J. Limbert*
                                              GEORGE J. LIMBERT
                                              UNITED STATES MAGISTRATE JUDGE